[No. B109985. Second Dist., Div. Five. Dec. 8, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
HOLLY FAYE WILSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the indicated portions of part III.

## COUNSEL

Mark D. Hammond, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and B. Kathleen Blanchard, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### TURNER, P. J.—

## I. INTRODUCTION

Defendant, Holly Faye Wilson, appeals after she was convicted of methamphetamine possession in violation of Health and Safety Code section 11377, subdivision (a) as a felony. On appeal, she contends that her motion to suppress the contraband and her statements should have been granted. The Attorney General argues defendant received an excessive grant of presentence credits. In the published portion of the opinion, we address the

question of whether the Fourth Amendment of the United States Constitution requires that defendant's inculpatory statements and the contraband be suppressed.

## II. THE FACTS PERTINENT TO THE PENAL CODE SECTION 1538.5 SUPPRESSION OF EVIDENCE MOTION

Defendant argues that her motion to suppress her statements and the contraband pursuant to Penal Code section 1538.5 should have been granted. When the applicable standard of review is applied (*Ornelas* v. *United States* (1996) 517 U.S. 690, 697 [116 S.Ct. 1657, 1662, 134 L.Ed.2d 911]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221]), the following was the evidence before the trier of fact. On March 10, 1995, Officer Charlton Vidal of the Glendale Police Department was driving a patrol car in the parking lot of the Capri Motel. He saw the registration tab on the license plate on a blue Cadillac had been "pulled away on all four corners." Officer Vidal was able to verify the registration was expired. He determined to conduct an investigation concerning a possible felonious violation of Vehicle Code section 4463,[1] which involves an effort to falsify information concerning the payment of registration fees. Officer Vidal spoke with the manager and determined that the car belonged to the occupants of room 22 of the motel.

---

[1]Vehicle Code section 4463 states: "(a) Every person who, with intent to prejudice, damage, or defraud, commits any of the following acts is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison for 16 months, two or three years, or by imprisonment in the county jail for not more than one year: [¶] (1) Alters, forges, counterfeits, or falsifies any certificate of ownership, registration card, certificate, license, license plate, device issued pursuant to Section 4853, special plate, or permit provided for by this code or any comparable certificate of ownership, registration card, certificate, license, license plate, device comparable to that issued pursuant to Section 4853, special plate, or permit provided for by any foreign jurisdiction, or alters, forges, counterfeits, or falsifies any such document, device, or plate with intent to represent it as issued by the department, or alters, forges, counterfeits, or falsifies with fraudulent intent any endorsement of transfer on a certificate of ownership or other document evidencing ownership, or with fraudulent intent displays or causes or permits to be displayed or have in his or her possession any blank, incomplete, canceled, suspended, revoked, altered, forged, counterfeit, or false certificate of ownership, registration card, certificate, license, license plate, device issued pursuant to Section 4853, special plate, or permit. [¶] (2) Utters, publishes, passes, or attempts to pass, as true and genuine, any false, altered, forged, or counterfeited matter listed in subdivision (a) knowing it to be false, altered, forged, or counterfeited." Vehicle Code section 4853 defines a "device" as a tab such as the one that had been altered in the present case as follows: "The department may issue one or more stickers, tabs, or other suitable devices in lieu of the license plates provided for under this code. Except where the physical differences between the stickers, tabs, or devices and license plates by their nature render the provisions of this code inapplicable, all provisions of this code relating to license plates may apply to stickers, tabs, or devices."

Officer Vidal summoned his supervisor, Sergeant Hodgman. She agreed with Officer Vidal that the occupants of room 22 should be interviewed. Officer Vidal knocked on the door and spoke to a man named John Patrick Walsh, who was a codefendant at the time of trial but who is not a party to this appeal. Mr. Walsh was dressed in his underwear. Mr. Walsh was asked by Officer Vidal who owned the blue Cadillac with the expired registration. Mr. Walsh was asked if he would mind going out to the parking lot to answer some questions about the Cadillac. Mr. Walsh agreed to go to the parking lot to but asked if he could dress first.

After dressing, Mr. Walsh walked to the parking lot with Officer Vidal. When asked about the registration, Mr. Walsh claimed he had "no idea" about it. Mr. Walsh then claimed the car belonged to a girlfriend. He then changed his story and claimed the Cadillac belonged to a friend. Then he changed his explanation again and stated he did not know who owned the Cadillac. Then, Mr. Walsh changed his story again. He stated that the Cadillac belonged to his "girlfriend," defendant, who remained in room 22.

Sergeant Hodgman remained with Mr. Walsh while Officer Vidal returned to room 22. Ten to twelve minutes had passed since Mr. Walsh accompanied Officer Vidal and Sergeant Hodgman to the parking lot from room 22. Officer Vidal knocked on the door of room 22 and it swung open "approximately a third" of the way. Prior to when he knocked on it, the door was described by Officer Vidal as being "in a closed position up against the jamb." Officer Vidal saw defendant. She was reaching under one of the two beds with her left hand. Her hand was underneath one of the two beds when the door swung open. Officer Vidal could not see defendant's left shoulder and arm which were under the bed. Officer Vidal then stepped into the room. He explained his reason for stepping into the motel room as follows: "Because of where she was, my not being able to see her hands, I wanted to get a position of advantage in case she came out with a weapon. You never know." Officer Vidal further testified: "We are trained in day one in the academy the only way a suspect can hurt you is with their hands. The position under the bed. [¶] I was there for a registration investigation, so I have no idea what I have, why her hands are under a bed. I thought maybe it would be a weapon." Officer Vidal described his thoughts and movement into the room as follows, "Officer awareness kicks in and I opened the door a little further to see if there is anyone who can harm me and I stepped in."

When Officer Vidal stepped into the room, defendant then stood up and was extremely nervous. As she began to stand up, Officer Vidal entered the room. Officer Vidal asked her who owned the blue Cadillac. She responded

that the car belonged to her boyfriend, Mr. Walsh. She then changed her story and said the Cadillac belonged to her. She then admitted that she knew the registration was false. She was asked if there were any drugs in the room. Defendant denied there were any drugs in the motel room. She was then asked what she was hiding under the bed. Defendant responded, " 'Okay it is only a little meth.' " Officer Vidal asked permission to retrieve the methamphetamine. She stated, "[Y]es." Officer Vidal recovered two syringes and methamphetamine. She was asked if there were any other drugs in the apartment and she said, "[N]o." She then gave Officer Vidal permission to search the remainder of the motel room and more syringes and drugs were recovered.

## III. DISCUSSION

Defendant argues that when she was observed to be reaching under the bed by Officer Vidal as the door swung open and he stepped in to the room before the first question was asked concerning the drugs, no exigent circumstances warranted his entry. We disagree. This issue involves the application of the Fourth Amendment. Entry across the threshold into a motel room as occurred here normally requires a search warrant. (*Stoner* v. *California* (1964) 376 U.S. 483, 486-490 [84 S.Ct. 889, 892-894, 11 L.Ed.2d 856]; *People* v. *Williams, supra,* 45 Cal.3d at p. 1297.) However, if there is a sufficient exigency, the Fourth Amendment warrant requirement may be excused. (*Minnesota* v. *Olson* (1990) 495 U.S. 91, 100 [110 S.Ct. 1684, 1690, 109 L.Ed.2d 85]; *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 749-750 [104 S.Ct. 2091, 2097, 80 L.Ed.2d 732].) **(2)** In *People* v. *Glaser* (1995) 11 Cal.4th 354, 365 [45 Cal.Rptr.2d 425, 902 P.2d 729], a case involving a temporary detention of a person at gunpoint, Associate Justice Werdegar articulated the test to be applied in determining whether there has been a Fourth Amendment violation as follows: "To test the detention against 'the ultimate standard of reasonableness embodied in the Fourth Amendment' ([*Michigan* v. ]*Summers* [(1981) 452 U.S. 692, 699-700 [101 S.Ct. 2587, 2593, 69 L.Ed.2d 340]]), we balance the extent of the intrusion against the government interests justifying it, looking in the final and dispositive portion of the analysis to the individualized and objective facts that made those interests applicable in the circumstances of the particular detention. (*Terry* [v. *Ohio* (1968) 392 U.S. 1,] 21 [88 S.Ct. 1868, 1879-1880, 20 L.Ed.2d 889]; *Summers, supra,* 452 U.S. at p. 703 [69 L.Ed.2d at p. 350].)" The United States Supreme Court has mandated that we apply an objective test to the constitutional evaluation of the actions of Officer Vidal. (*Ohio* v. *Robinette* (1996) 519 U.S. 33, __ [117 S.Ct. 417, 419-421, 136 L.Ed.2d 347]; *Whren* v. *United States* (1996) 517 U.S. 806, 813-817 [116 S.Ct. 1769, 1774-1776, 135

L.Ed.2d 89]; *Scott* v. *United States* (1978) 436 U.S. 128, 138 [98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168].)

With these thoughts in mind, we evaluate the appropriateness of the conduct of Officer Vidal by first examining the "character of the official intrusion." (*Michigan* v. *Summers* (1981) 452 U.S. 692, 701 [101 S.Ct. 2587, 2593, 69 L.Ed.2d 340]; *People* v. *Glaser, supra,* 11 Cal.4th at pp. 365-366.) As noted previously, it is well established that there is a reasonable expectation of privacy in a motel room. The Attorney General rightly does not contest that an intrusion giving rise to constitutional protection occured in the present case. Normally absent exigent circumstances or a consent, a state official may not enter a motel room under these circumstances without securing the permission of a neutral and detached magistrate. The protection against arbitrary governmental action goes to the very essence of our concepts of ordered liberty in a constitutional democracy. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081]; see *Washington* v. *Glucksberg* (1997) __ U.S. __-__ [117 S.Ct. 2258, 2268, 138 L.Ed.2d 772].) As in *Glaser,* though there are several factors that diminish the intrusiveness. To begin with, when he left the motel room with Officer Vidal and Sergeant Hodgman, Mr. Walsh did not completely close the door. The door was not entirely closed when Officer Vidal returned and knocked on it causing it to swing open. Further, Officer Vidal only took a single step into the room when he saw defendant reaching under the bed. This is different from cases where officer safety factors have been weighed and the entire premises were searched. (Cf. *Maryland* v. *Buie* (1990) 494 U.S. 325, 334 [110 S.Ct. 1093, 1098-1099, 108 L.Ed.2d 276] [entire residence searched for other suspects].) Moreover, no seizure of defendant's person occurred at the time of the intrusion. (Cf. *Ybarra* v. *Illinois* (1979) 444 U.S. 85, 94 [100 S.Ct. 338, 343-344, 62 L.Ed.2d 238] [search of all patrons in a tavern].) Moreover, defendant was not held at gunpoint, as was the case in *Glaser*; this factor reduces the intensity of the intrusion. (11 Cal.4th at p. 367; *People* v. *Hannah* (1996) 51 Cal.App.4th 1335, 1343 [59 Cal.Rptr.2d 806].) Finally, there was no evidence that any other person saw Officer Vidal step into the motel room. The fact a Fourth Amendment intrusion is not observed by others is a factor in determining its reasonableness. (*Michigan* v. *Summers, supra,* 452 U.S. at p. 702 [101 S.Ct. at p. 2594]; *People* v. *Glaser, supra,* 11 Cal.4th at p. 367.)

The second aspect of Fourth Amendment analysis involves an evaluation of the justification for the step into the motel room by Officer Vidal. (*Michigan* v. *Summers, supra,* 452 U.S. at p. 701 [101 S.Ct. at p. 2593]; *People* v. *Glaser, supra,* 11 Cal.4th at pp. 367-368.) As in *People* v. *Glaser,*

*supra*, 11 Cal.4th at page 367, there are "[t]wo interrelated justifications . . . readily identifiable on this record." The first justification is that, at the very least, there was reasonable suspicion defendant was involved in a possible felony. As in *Glaser*, the second consideration was Officer Vidal's "concern for security" while engaged in a felony investigation. (Cf. *id.* at pp. 367-368.) To begin with, by the time Officer Vidal had returned to the motel room he certainly, viewed objectively, was in possession of facts which at the very least involved a reasonable suspicion which would warrant a temporary detention of defendant. (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 880 [95 S.Ct. 2574, 2578-2580, 45 L.Ed.2d 607]; *Adams* v. *Williams* (1972) 407 U.S. 143, 145 [92 S.Ct. 1921, 1923, 32 L.Ed.2d 612].) She was in the motel room and linked to the car with the fraudulently altered registration tab. Mr. Walsh directly stated she was the owner of the car with the fraudulent registration tab, although he changed his story several times. Further, one of the constitutional purposes of a temporary detention is to gain more information. (*Hayes* v. *Florida* (1985) 470 U.S. 811, 816 [105 S.Ct. 1643, 1647, 84 L.Ed.2d 705]; *Adams* v. *Williams, supra,* 407 U.S. at p. 146 [92 S.Ct. at p. 1923].) Officer Vidal had every reason to return to the motel room to speak with defendant, given the wildly inconsistent statements of Mr. Walsh.[2] In the words of *Terry* v. *Ohio* (1968) 392 U.S. 1, 30 [88 S.Ct. 1868, 1884, 20 L.Ed.2d 889], Officer Vidal had good reason to conclude "that criminal activity may be afoot" and defendant was involved.

The additional pertinent governmental justification involves the safety of Officer Vidal. The justification offered by the Attorney General is that Officer Vidal stepped into the room so that he could better see defendant, who could have been reaching under the bed for a weapon. In making Fourth Amendment reasonableness assessments, courts have regularly considered the safety risks confronting investigating officers. In *Maryland* v. *Wilson* (1997) 519 U.S. 408, __ [117 S.Ct. 882, 884, 137 L.Ed.2d 41], the United States Supreme Court relied on officer safety considerations in part in determining whether as a matter of course a passenger could be ordered out of an automobile when the driver had been stopped for a traffic violation. In *Maryland* v. *Buie, supra,* 494 U.S. at page 334 [110 S.Ct. at pages 1098-1099], the United States Supreme Court assessed the dangers to officers posed by potential hidden assailants in a home where a suspect was arrested. In *Pennsylvania* v. *Mimms* (1977) 434 U.S. 106, 110 [98 S.Ct. 330, 333, 54 L.Ed.2d 331], the United States Supreme Court considered the risks to a

---

[2]We do not address the issue as to whether there was probable cause to arrest defendant based on her presence in a motel room the occupants of which had arrived in the car with the unlawful registration tab. We assume for the sake of discussion that when the facts are viewed objectively, Officer Vidal only had a reasonable suspicion a felonious effort had been made to alter the registration tab of a car possibly possessed by defendant.

police officer during a traffic stop in conducting the Fourth Amendment reasonableness assessment. In *Terry* v. *Ohio, supra,* 392 U.S. at page 23 [88 S.Ct. at page 1881], the Supreme Court weighed safety factors in setting forth the scope of an officer's powers to detain and search in circumstances in which where probable cause was not present. In *People* v. *Glaser, supra,* 11 Cal.4th at pages 366-368, the California Supreme Court weighed the officer security aspects involved in the decision to order a person approaching a residence where a search warrant was being served, to lie prone on the ground at gunpoint.

In making these assessments, the United States Supreme Court has made it clear the Fourth Amendment exclusionary rule is not to be interpreted so as to endanger police officers in the responsible performance of their duties. In *Pennsylvania* v. *Mimms, supra,* 434 U.S. at page 110 [98 S.Ct. at page 333], citing *Terry* v. *Ohio, supra,* 392 U.S. at page 23 [88 S.Ct. at page 1881], the United States Supreme Court noted: "We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' [Citation.]" In *Maryland* v. *Buie, supra,* 494 U.S. at page 333 [110 S.Ct. at pages 1097-1098], in assessing the legitimacy of a sweep for hidden persons in a residence, the Supreme Court noted, "In *Terry* [v. *Ohio, supra,* 392 U.S. at page 21 [88 S.Ct. at pages 1879-1800]] and [*Michigan* v.] *Long* [(1983) 463 U.S. 1032, 1047 [103 S.Ct. 3469, 3479-3480, 77 L.Ed.2d 1201]] we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter."

When we apply the foregoing body of constitutional law to the official intrusion in the present case, Officer Vidal's conduct in taking a step over the threshold so he could more clearly see defendant as she was reaching under one of the beds met the Fourth Amendment objective standard of reasonableness. Officer Vidal's assessment that such a limited intrusion was necessary given the risks defendant was arming herself was objectively reasonable. Mr. Walsh, defendant's companion, had indicated she was the

owner of the car containing a registration tab that potentially violated Vehicle Code section 4463. Mr. Walsh also changed his story as to the owner of the Cadillac when he was informed about the potential registration violation. When Officer Vidal returned to the room, the door, which was ajar, opened when he knocked upon it. When the door opened, he saw defendant reaching under one of the beds. Solely in order to gain an advantage in the event she produced a weapon, Officer Vidal acted reasonably by stepping into the room. Further, it bears emphasis he took no further steps than necessary in order to be in a better position in the event she produced a weapon. Accordingly, in the present case the limited intrusion made in the face of a legitimate concern about personal safety did not violate the Fourth Amendment. (*Maryland* v. *Buie, supra,* 494 U.S. at p. 332 [110 S.Ct. at p. 1097].)

The circumstances in the present case are far more compelling than those present in *Buie*. In *Buie*, the authorities entered the defendant's residence armed with an arrest warrant. There was no search warrant. While handcuffing the defendant, investigators fanned out throughout the residence in an effort to determine if other persons were present. The investigators had neither probable cause nor reasonable suspicion to believe that anybody else was present. The United States Supreme Court held that the search for other persons based on the investigators' concerns for their safety were reasonable. The court concluded: "We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* [v. *Ohio, supra,* 392 U.S. at page 21 [88 S.Ct. at pages 1879-1880]] and [*Michigan* v.] *Long* [(1983) 463 U.S. 1032, 1049-1050 [103 S.Ct. 3469, 3479-3480, 77 L.Ed.2d 1201]], and as in those cases, we think this balance is the proper one." (*Maryland* v. *Buie, supra,* 494 U.S. at p. 334 [110 S.Ct. at p. 1098], fn. omitted.) In present case, there were specific articulable facts relating to a potential danger which, when viewed objectively, warranted Officer Vidal's stepping into the room to be better prepared in the event defendant produced a weapon. Hence, defendant's answers to Officer Vidal's brief questions as to the blue Cadillac and what she was reaching for were proper. Further, her consent to search was not tainted by the brief inquiries.

Defendant argues that Officer Vidal's justification for the intrusion was pretextual. Defendant reasons that if Officer Vidal was really concerned about his safety, he never would have stepped into the room. Rather, she reasons that if Officer Vidal was really concerned about his safety, he would have retreated, not stepped into a zone of potential danger. This contention finds no support in Fourth Amendment jurisprudence. Appellate courts have repeatedly emphasized it is inappropriate for judges to second-guess on-the-spot decisions of officers in the field under these circumstances. The District of Columbia Circuit has noted, "As long as police measures are not deliberately designed to invent exigent circumstances, we will not second-guess their effectiveness." (*U.S.* v. *Socey* (D.C. Cir. 1988) 846 F.2d 1439, 1449 [269 App.D.C. 453]; accord, *Menuel* v. *City of Atlanta* (11th Cir. 1994) 25 F.3d 990, 996 [applying Fourth Amendment to excessive force allegation].)

█ In applying the Fourth Amendment exclusionary rule, courts are hesitant to make hindsight assessments of how an officer should have responded differently to exigent circumstances. (*U.S.* v. *Socey, supra,* 846 F.2d at p. 1446; *U.S.* v. *Rivera* (7th Cir. 1987) 825 F.2d 152, 156.) █ When Officer Vidal observed her reaching under the bed, immediate action was necessary; we may not engage in the luxury of second-guessing his tactical decision to utilize his command presence to control the situation by stepping into the room. (*Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 925 [226 Cal.Rptr. 868, 719 P.2d 242] ["reluctance to second guess split-second decisions of officers faced with potentially dangerous situations"]; *People* v. *Higgins* (1994) 26 Cal.App.4th 247, 254 [31 Cal.Rptr.2d 516] ["[the officer] could reasonably have concluded that he did not enjoy that luxury, and that immediate action was warranted"]; *People* v. *Dickey* (1994) 21 Cal.App.4th 952, 957 [27 Cal.Rptr.2d 44] ["The judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety."].) Police officers when confronted with a potential threat may choose to use varying levels of force or, as here, to utilize mere presence in an attempt to defuse a situation. We do not foreclose the possibility Officer Vidal could have engaged in more intrusive actions. We limit our review to whether what he did in this case met the Fourth Amendment reasonableness requirement. Depending on the circumstances, Officer Vidal could have done more than merely step into the room and use his command presence to control the potentially dangerous situation. It is noteworthy that Officer Vidal's conduct caused defendant to stand up and move her hand away from the place where a potential weapon could have been concealed. Given the express and implied factual findings of the trial court, there is no merit to the suggestion that because Officer Vidal did not retreat or chose different tactics, there were as a matter of law no *exigent circumstances. The motion to suppress* pursuant to Penal Code section 1538.5 was properly denied.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

## IV. DISPOSITION

The judgment is affirmed. Upon issuance of the remittitur, defendant's presentence conduct credits are to be increased from 14 to 16 actual days. She is to receive eight days of conduct credits.

Grignon, J., and Jackson, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied March 25, 1998.

---

*See footnote, *ante*, page 1053.

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.