DECISION
On December 18, 1997, pursuant to the Rhode Island Supreme Court's directive, a hearing was held to consider the defendant Sean E. Milette's motion to suppress a handgun which was seized from a vehicle that he was driving. State v. Milette, ____ A.2d ____, No. 96-357-C.A. (R.I. November 7, 1997). The factual findings below are gleaned from the January 10, 1996 trial transcript and the supplemental testimony adduced at that December 18 hearing.
* * *
While at a stationary radar position on the morning of August 2, 1995, Rhode Island State Police Trooper James Manni recorded the defendant driving southbound at eighty miles per hour, well beyond the fifty-five-mile-per-hour speed limit on Route 295 in Cranston, Rhode Island. As he sped by Manni, the defendant and a front-seat male passenger saw Manni's marked cruiser. Manni immediately gave chase, activating his overhead emergency lights.
While in pursuit, Manni noticed the defendant and the passenger make several furtive movements within the vehicle which aroused his suspicions and concerns. On a number of occasions they leaned forward and backward in dipping and jerking motions. When the defendant eventually pulled the vehicle into the right breakdown lane and stopped, Manni observed the two occupants quickly exchange some words, and the defendant again bent forward while the passenger peered out the rear window at Manni.
As Manni alit from his cruiser, he noticed that the defendant had already extended his arm from the driver's window, presumably with his license and vehicle documentation. From his experience as a six-year State Police trooper, Manni considered that type of premature activity as an effort to divert his attention from the interior of the car. Concerned for his safety after having earlier observed the suspicious movements within the vehicle as well as the defendant's unrequested tendering of documentation, Manni cautiously approached the passenger side of the car.
Both the defendant and the passenger were barechested and had several Nazi and "skinhead" tattoos emblazoned on their bodies. On the rear seat of the car Manni saw a large metal Nazi emblem, along with white supremacy pamphlets. Manni, a former United States Secret Service agent, knew full well from his federal experience and training that those who were connected with such supremacy movements were typically prone to violence and were usually armed. Further, both of the defendant's arms were adorned with large spider-web tattoos. Manni, from his Secret Service training, knew that a spider-web tattoo was deemed by skinhead members to be a badge of honor for violence. The defendant sported two of them.
After having retrieved a driver's license and vehicle documentation from the defendant, Manni, who was alone at the time, returned to his cruiser and radioed for assistance. Two more state troopers arrived shortly thereafter. Manni then directed both the defendant and the passenger to exit the vehicle and stand near the other two officers. The defendant and the passenger complied, leaving both car doors wide open. Manni then bent down by the driver's side, canted his head slightly toward the interior of the car, and looked under the driver's seat. No more than an inch from the front edge of the driver's seat he immediately saw a handgun, which he retrieved and unloaded.
The defendant complains that Manni conducted an impermissible search of the vehicle and that his subsequent seizure of the firearm was illegal. The court disagrees.
It is beyond peradventure that a police officer may, as a matter of course, order a driver and any passengers to exit a lawfully stopped vehicle. Pennsylvania v. Mimms, 434 U.S. 106, 98. S.Ct. 330 (1977); Maryland v. Wilson, ____ U.S. ____, 117 S.Ct. 882 (1997); State v. Tavarez, 572 A.2d 276 (R.I. 1990); State v. Soares, 648 A.2d 804 (R.I. 1994); State v. Collodo,
611 A.2d 62 (R.I. 1995).
When the defendant acceded to Trooper Manni's lawful directive to get out of the car, he left the driver's door wide open, fully exposing the lower interior of the vehicle compartment to Manni's view. Manni did little more than bend down, cant his head slightly, and look under the driver's seat which the defendant had left exposed. There, in plain view and without any intrusive searching, Manni saw the revolver only an inch away from the front edge of the seat. No Fourth Amendment rights of the defendant were impacted thereby. Mere observation, after all, does not constitute a search. Coolidqe v. NewHampshire, 403 U.S. 443, 91 S.Ct. 2022 (1971); Horton v.California, 496 U.S. 128, 110 S.Ct. 2301 (1990) (eliminating the "inadvertent discovery" test in Coolidge); accord, State v.Pratt, 641, A.2d 732, 738 (R.I. 1994).
 "That the officer might not have seen the pistol unless he was bending down is immaterial. An object may be regarded as in plain view even though the observer had to `crane his neck, or bend over, or squat,' in order to spot it." Rippy v. United States, 332 A.2d 276, 278 (D.C. App. 1974), quoting James v. United States, 418 F.2d 1150, 1151 n.l (U.S.App.D.C. 1969).
As the Rhode Island Supreme Court has stated, "A police officer may have to stand at attention in the presence of superior officers, but we refuse to impose a duty that police officers must be parade-ground rigid when stopping a vehicle."State v. Aubin, 622 A.2d 444, 445 (R.I. 1993) (upholding the seizure of weapon by an officer who shone a flashlight into a vehicle and simultaneously leaned slightly into an open window, thereby enabling him to observe a gun partially beneath the driver's feet). "Justice should be blind, but law enforcement should not." State v. Rattenni, 117 R.I. 221, 225, 366 A.2d 539, 542 (R.I. 1976).
Even if Trooper Manni's actions constituted a search, it was nonetheless permissible as a precautionary, protective measure for officer safety. Federal and state courts have consistently recognized that roadside stops are inherently fraught with danger to police officers. Pennsylvania v. Mimms, ante; Adams v.Williams, 407 U.S. 143, 92 S.Ct. 1921 (1972); State v. Tavarez,ante. With such potential hazards in mind, and drawing upon Terryv. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968) and its progeny, the United States Supreme Court has justified limited protective searches of motor vehicles. Michigan v. Long, 463 U.S. 1032, 1049-1050, 103 S.Ct. 3469, 3481 (1983):
 "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on `specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."
This court finds that Trooper Manni unquestionably had a rational belief, based upon his experience and observations, that the occupants of this vehicle posed a potential danger. Their continual bending forward and backward rightfully aroused his suspicions. Although furtive actions, by themselves, may not be enough to rise to a Terry level, when, as here, they are made inresponse to the approach of police, such gestures take on an enhanced and much more significant meaning for an experienced law enforcement officer. State v. Tavarez, ante, 572 A.2d at 278;People v. Conley, 21 Cal.App.3d 874, 899, 18 Cal.Rptr. 869, 872 (1971)("[T]he rationale of the furtive gesture doctrine applies only where the gesture is made in response to seeing anapproaching police officer; the theory is that it is a natural impulse on confrontation for a guilty person to conceal contraband . . . The furtive gesture doctrine is analogous to leaving the scene of a crime or fleeing from an approaching officer"). (Emphasis added.)[1]
The furtive actions which Manni observed were similar to and, indeed, more numerous than those in Tavarez, and they were madeimmediately after Manni had activated his emergency lights in pursuit of the defendant. Those responsive furtive gestures, the defendant's premature and suspicious tendering of his license and other vehicle documents, which Manni reasonably believed were intended to distract his attention from the car's interior, together with the presence of decals and trappings that the trooper immediately recognized as hallmarks of violence and firearms, provided Manni with ample, articulable cause for concern.[2]
At the suppression hearing the defendant insisted that the court could not consider the Nazi and skinhead evidence because it had been excluded at trial and that, in any event, it was a constitutionally protected expression of First Amendment rights. Those arguments are without merit. The court ordered this material redacted from the State's trial evidence pursuant to the defendant's motion in limine, solely in order to shield the defendant from an unfairly prejudicial reaction by the jurors. That evidence is, however, unquestionably relevant to the suppression motion, because it bears directly upon Trooper Manni's knowledge, experience, and training and this court's assessment of whether that officer's actions were reasonable under the totality of the circumstances. United States v.Sokolow, 490 U.S. 1, 109 S.Ct. 1581 (1989); United States v.Cortez, 449 U.S. 411, 101 S.Ct. 690 (1981); State v. Ortiz,609 A.2d 921, 925-26 (R.I. 1992). The trooper's "observations and the totality of the circumstances `must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."' State v. Collado, ante,
661 A.2d at 66, quoting United States v. Cortez, ante, 449 U.S. at 418, 101 S.Ct. at 629.
Further, as pointed out in Cortez and Collado, the court's assessment should include, inter alia, "consideration of the modes or patterns of operation of certain kinds of lawbreakers" from which the officer is expected to draw "inferences and deductions that might well elude an untrained person" Id. Manni knew from his federal years of experience and training that followers of white supremacy movements, particularly skinheads, typically acted outside the bounds of the law, with violence and with firearms. Accordingly, Manni was scarcely obliged to turn a blind eye to what he knew full well were clear indicia of violent lawlessness. Indeed, to have done so would have been antithetical to his obligations as a law enforcement officer and totally offensive to common sense. "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same — and so are law enforcement officers." United States v. Cortez, ante, 449 U.S. at 418, 101 S.Ct. 695.
Contrary to the defendant's further contention, directing the defendant and his passenger out of the vehicle, with its driver and passenger doors wide open, and ordering them to stand, unhandcuffed, near two other officers did not lessen the potential for danger. In Michigan v. Long, ante, the Supreme Court rejected the argument that simply because the occupants have exited the vehicle and are "in the control" of the officers they no longer pose a danger. "This reasoning is mistaken in several respects," said the Court, explaining that the term "in the control" of the officers merely refers to a suspect's brief detention during which he could break away and retrieve a weapon from the vehicle. Further, absent an arrest, the suspect would thereafter be permitted to reenter his vehicle and then have ready access to any weapons therein. Id. at 436 U.S. at 1051-52, 103 S.Ct. at 3482. Accord, United States v. Cummins,920 F.2d 498, 502 (8th Cir. 1990) ("This limited search is no less permissible where, as here, the occupants have been removed from the automobile before the search is made"); United States v.Holifield, 956 F.2d 665, 669 (7th Cir. 1992); People v. Ritter,54 Cal.App.4th 274, 279-280, 62 Cal.Rptr.2d 686, 689 (1997) (espousing Michigan v. Long's rationale that protective searches are permissible even when a detained suspect is "under the control of the officer and cannot gain access to weapons . . . The Long court stressed that an officer remains particularly vulnerable during Terry investigations because of the close range and the necessity for a `quick decision as to how to protect himself and others from possible danger"'); People v. Lafitte,211 Cal.App.3d 1429, 1433, 259 Cal.Rptr. 915, 917 (1989) (expressing the view that Michigan v. Long allows "more leeway in the officer's decision that a suspect is `armed and dangerous' even for minor offenses"); People v. Houldridge, 454 N.E.2d 769, 773 (Ill. App. 1983) ("[I]t is irrelevant whether the area searched is within reach of the suspects at the time of the search," applying Michigan v. Long). In United States v.Wilkerson, 598 F.2d 621, 625 (U.S.App.D.C. 1978), five years prior to Michigan v. Long's approval of protective searches of vehicles, that Court presciently observed:
 "It takes little imagination to realize that an armed suspect might hide his weapon in a car before getting out in response to a police order. Thereafter, standing next to the car without handcuffs, either the driver or one of the passengers could have bolted to it, seized a weapon and fired before the officers could find cover.
 * * *
 "Fourth Amendment jurisprudence involves prudence for police as well as fairness for citizens. A police officer `need not defer . . . protective measures to the point of peril."'
At the suppression hearing the defendant also suggested that a protective search was unjustified because the trooper was only looking for contraband, not weapons. The defendant is mistaken. A review of the trial record clearly reflects that Manni was worried about his safety from the inception. Indeed, his concern was such that upon his initial approach toward the vehicle he altered his usual route to the driver's side; instead, he cautiously approached the passenger side, believing that the occupants would more probably be expecting him to arrive at the driver's window. Further, it is precisely because of those safety concerns that he radioed for back-up assistance. Tr. at 71-73. The trial transcript reflects Manni's clear intention to ascertain if there was a weapon in the car, along with any contraband. Tr. at 130, 133-134.[3]
In sum, Trooper Manni's actions conformed to Mr. Justice Kelleher's lasting observations some twenty years ago in a similar context: The officer kept his wits about him and his eyes open; to have done otherwise would have been less than prudent.State v. Rattenni, ante, 117 R.I. at 225. Although Manni had to bend down and crane his neck slightly to see better, it was an entirely reasonable and appropriate safety measure to protect himself and the other officers with him. To hold otherwise would do scant justice to what our State Supreme Court and the United States Supreme Court have recognized as "the very great risk police officers encounter during routine traffic stops and society's great interest in ensuring the safety of police during such procedures." State v. Tavarez, ante, 572 A.2d at 278.
For all of the foregoing reasons, the defendant's suppression motion is denied. The judgment of his conviction for unlawful possession of the handgun remains as earlier recorded. State v.Milette, ante, Slip op. at 6 . .
[1] In United States v. Nash, 876 F.2d 1359, 1360-61 (7th Cir. 1989), the defendant raised himself from the car seat and reached forward toward the floor after the officer had stopped him for a driving infraction. The defendant was ordered out of the car, and the officer thereafter reached into vehicle and lifted a jacket from floor of the front seat and discovered marijuana. Held: "A reasonable interpretation of this `furtive gesture' was that the defendant was hiding a gun, thus giving [the officer] cause to be concerned about his safety" and justifying a protective search of the car under Michigan v. Long. (After a consent search, a firearm was, in fact, found under the driver's front seat). See,State v. Sutherland, 637 N.E.2d 366 (Ohio App. 1994) (After
having stopped the defendant for a driving violation, the officer observed the driver and passenger make movements consistent with placing something under the seat; license and registration were in proper order; both occupants were directed out of the vehicle, and a patdown yielded no weapons. Held: The officer's concern that the occupants' furtive movements reflected their concealment of weapons was reasonable and justified a protective search of the vehicle); People v. Cagle, 688 P.2d 718, 723 (Colo. 1984) ("The passenger's furtive conduct in bending down in his seatafter [the officer] turned on his overhead lights would have warranted a reasonable belief that the passenger had a weapon beneath his seat, thus justifying a weapons search in that area"), aff'd. after remand, 751 P.2d 614 (Colo. 1988).
[2] The defendant's reliance on People v. Superior Court ofYolo County (Kiefer), 91 Cal.3d 807, 91 Cal.Rptr. 729 (1970) is unavailaing, both in law and on its facts. The Kiefer court invalidated the seizure of contraband found in plain view when a police officer, who had lawfully stopped a speeding automobile, opened the passenger door after having seen the passenger make a single movement toward the floor of the car. Throughout its opinion the California court faulted the officer's lack of probable cause to open the passenger door and look into the car.Kiefer, however, predated Pennsylvania v. Mimms, Maryland v.Wilson, and Michigan v. Long, ante, all of which would now have permitted that California officer to have ordered the passenger from the vehicle, and the contraband, then exposed in plain view, would not have been suppressed. Today, California courts are clearly mindful of the teachings of those Supreme Court cases and have applied them in various contexts. E.q., People v. Wilson,59 Cal.App.4th 1053, 69 Cal.Rptr. 683, 687 (1997); People v.Franklin, 171 Cal.App.3d 627, 637, 217 Cal.Rptr. 529, 535 (1985);People v. Tello, 15 Cal.4th 264, 267, 62 Cal.Rptr. 437, 439 (1997). Factually, much more is present in the instant case than existed in the Keifer case. Keifer made only one move toward the floor. Both Milette and his passenger made several bending movements, and both possessed and sported the trappings of a violent supremacy movement, whose members were known by Trooper Manny typically to be armed. Manni did not open the defendant's door; the defendant did, and he left it wide open, exposing the interior to the trooper'; ready view.
[3] Even in situations where a police officer targets his search principally for drug ccntraband, he is hardly without risk of harm from any suspects who may be present. Officers and courts know full well that drugs and guns go hand in hand. State v.Pratt, 641 A.2d 732, 741 (R.I. 1994); State v. Alamont,577 A.2d 665, 668 (R.I. 1990); United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989).